# EXHIBIT 1

MARK M. BETTILYON (4798)
MICA MCKINNEY (12163)
**RAY QUINNEY & NEBEKER, P.C.**
36 South State Street, Suite 1400
P.O. Box 45385
Salt Lake City, Utah 84145-0385
  Telephone No.:  (801) 532-1500

*Attorneys for Plaintiffs*

---

IN THE SECOND JUDICIAL DISTRICT COURT
IN AND FOR DAVIS COUNTY, STATE OF UTAH
BOUNTIFUL DIVISION

| | |
|---|---|
| ALLVEST INFORMATION SERVICES, INC doing business as ASSESSMENTS.COM, a Washington corporation; GROWING FUTURES LLC, A Utah  limited liability company,<br><br>        Plaintiffs,<br><br>     v.<br><br>NOBLE SOFTWARE GROUP LLC, a Washington limited liability company,  MARK WINTERMAN, an individual; AARON PICTON, an individual; BRYAN PARKE, an individual; TROY PARKE, an individual; JONNA KOEHN, an individual; COLBY BROWN, an individual; DIANA COATES, an individual; BRET COPPESS, an individual,<br><br>        Defendants. | **COMPLAINT**<br><br>TIER THREE<br>(OVER $300,000)<br><br><br>Civil No.: _____<br><br>Judge: _____<br><br><br>JURY TRIAL DEMANDED |

Plaintiffs Allvest Information Services, Inc. doing business as Assessments.com and

Growing Futures LLC (collectively referred to herein as "ADC") bring this action to enjoin

defendants Noble Software Group LLC, Mark Winterman, Aaron Picton, Bryan Parke, Troy

Parke, Jonna Koehn, Diana Coates, Colby Brown and Bret Coppess from their continued

misappropriation of trade secrets and ongoing interference with corporate opportunities. Plaintiff

also seeks damages from the individual defendants, all former employees of ADC, for breach of

contract, conversion, breach of fiduciary duties, and civil conspiracy.

## PARTIES

1.      Plaintiff Allvest Information Services, Inc. ("Allvest") doing business as

Assessments.com is a Washington Company, with its headquarters in Bountiful, Utah. ADC

provides software solutions to probation and law enforcement agencies that are used to assess

and monitor adult and juvenile offenders on probation. Dean Andreasen serves as Receiver of

and Growing Futures pursuant to an order entered by the Second Judicial District Court for

Davis County, Utah in the divorce action entitled, *Tammie A. Hosman v. Sean B.D. Hosman*,

civil no. 114701956. Mr. Andreasen is an attorney with the law firm of Clyde Snow.

2.      Plaintiff Growing Futures LLC ("Growing Futures") is a Utah Limited Liability

Company. Growing Futures holds an interest in ADC's intellectual property and trade secrets.

3.      Defendant Noble Software Group LLC ("Noble") is a Washington limited

liability company with its principal place of business in California. Noble Software Group was

formed in March 2012. Noble Software also provides software solutions to probation agencies

and law enforcement that are used to assess and monitor adult and juvenile offenders on

probation.

Case 1:13-cv-00161-DAK   Document 6-2   Filed 11/15/13   Page 4 of 33

4.      Defendant Mark Winterman, upon information and belief, is a resident of Seattle, Washington.  Mr. Winterman is a software developer for Noble.  Until April 2012, Mr. Winterman was ADC's chief software engineer.

5.      Defendant Aaron Picton, upon information and belief, is a resident of California.  Aaron Picton is an accountant for Noble.  Until April 2012, Mr. Picton was the Chief Technology Officer for ADC.  Mr. Picton also assisted with accounting related issues.

6.      Defendant Diana Coates, upon information and belief, is a resident of Lake Jackson, Texas.  Diana Coates is the President of Noble.  Until April 2012, Ms. Coates was the President of ADC.

7.      Defendant Brian Parke, upon information and belief, is a resident of Cottonwood, California.  Until April 2012, Mr. Parke was an engineer for ADC.

8.      Defendant Troy Parke, upon information and belief, is a resident of Cottonwood, California.  Until April 2012, Mr. Parke was an engineer for ADC.

9.      Defendant Colby Brown, upon information and belief, is a resident of Caldwell, Idaho.  Until April 2012, Mr. Brown was an engineer for ADC.

10.     Defendant Jonna Koehn, upon information and belief, is a resident of Buckeye, Arizona.  Until March 2012, Ms. Koehn was a client representative for ADC.

11.     Defendant Bret Coppess, upon information and belief, is a resident of Caldwell, Idaho.  Until March 2012, Bret Coppess was a software engineer for ADC.

12.     ADC is informed and believes and thereon alleges that at all times herein mentioned, defendants and each of them were, separately and together, primary participants and

aided and abetted in a common course of misconduct as alleged herein in order to enrich themselves at ADC's expense.  Each of these defendants was the agent, employee, partner, joint venturer and/or co-conspirator, of the co-defendants, and in doing the things herein alleged was acting within the course and scope of such agency, employment, partnership, joint venture and/or conspiracy and under the direction of, and with the consent and permission, advance knowledge, and or subsequent ratification of the co-defendants.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction under Utah Code Ann. § 78A-5-102.

14.     Venue is proper in this Court pursuant to Utah Code Ann. §§ 78B-3-304. 78B-3-307(3).

**GENERAL ALLEGATIONS**

*(ADC's Software)*

15.     ADC is a leading provider of evidence-based practice software for probation and law enforcement agencies.  In connection with its business, ADC, over the course of numerous years, has developed proprietary, evidence-based assessment and monitoring software.  ADC uses its proprietary software, in conjunction with third-party assessment tools, to provide its customers with a complete software package that provides customized assessment tools that allow probation and law enforcement agencies to evaluate adult and juvenile offenders on probation, to create tailored case plans for the probationer, and to monitor the success and challenges of the probationer.  The software can also generate outcome reports and other administrative functions—all from the same software suite.

4

16.     At the core of ADC's unique software package is a proprietary database made up of relational tables that link information and data based on proprietary stored procedures and web services.  The assessment tools and analytical processing in ADC's software are both tied to the database with programming that links directly to the relational tables in the database.

17.     ADC offers its software and services in two ways: (1) a software license for in-house use of software and database storage (an "enterprise contract") and (2) a hosted software license which involves installation of the user interface segment of the software but storage of the database on ADC's servers (a "hosted contract").  Under either format of license, the software design, architecture and programming, including the design and programming of the database remains the protected property of ADC.  At the termination of either contract, customers are required to cease use of all ADC software, including its proprietary database.

18.     ADC also maintains a subscription schedule, which includes a customer list and other information particular to ADC and its contracts.

*(ADC's Trade Secrets)*

19.     The software described above, including the user interface, the stored procedures and web services, the proprietary database, and the data and forms underlying these processes, and ADC's subscription schedule and the other confidential and proprietary information described above are referred to herein as ADC's "trade secrets."

20.     ADC's trade secrets contain unique material that was developed by ADC and are not generally known in the industry.

21.     ADC developed its assessment software over the course of numerous years and expended substantial amounts in connection with the research, creation and development of its trade secrets.

22.     Since the development of its trade secrets, ADC has been and still is the sole owner of all rights, title and interest in and to the trade secrets. The trade secrets have actual or potential economic value and derive independent economic value from not being readily ascertainable by proper means.

*(Protection of ADC's Trade Secrets)*

23.     ADC has undertaken reasonable steps to ensure that the trade secrets remain just that, secret.

24.     For example, ADC requires its employees to sign agreements[1] that obligate them to maintain the confidentiality of, and prohibit them from misusing, ADC's trade secrets. Specifically, ADC's Employee Manual provides that

> By continuing employment with ADC, employees agree that they will not disclose or use any of ADC's confidential information in an unauthorized manner, **either during or after their employment**. Confidential materials include, but are limited to, written documents, training materials, procedures, policies, computer code, electronic mail. . . . [E]mployment with ADC assumes an obligation to maintain confidentiality, even after an employee's separation from the company.

25.     In all of its business interactions ADC has maintained the position that its software, including the underlying source code, object code, and architecture, are trade secrets

---

[1] Due to the improper acts of the individual defendants, ADC is not able to locate the executed copies of the documents. *See infra* ¶¶56-58. However, the employee manual in which this agreement is located was discussed with all employees in April 2011 and posted on the employee portal on or about the same time for all employees to access.

Case 1:13-cv-00161-DAK   Document 6-2   Filed 11/15/13   Page 8 of 33

and has explicitly stated such. ADC's standard client contracts provide and require the customer to acknowledge that ADC's software, including its source code, object code and other programs are "not generally known or available in the industry" and constitute "trade secrets" and require customers to protect the proprietary nature of ADC's software.

26.     ADC also requires that customers who terminate license and/or professional service agreements with ADC discontinue use of ADC's materials, remove licensed software, return material and destroy any and all backup copies.

*(The Defendants)*

27.     Defendants Mark Winterman, Aaron Picton, Bryan Parke, Colby Brown, Diana Coates, and Brett Coppess were all employees of the ADC. Defendants Jonna Koehn and Troy Parke were agents for ADC.

28.     Defendants Diana Coates, Mark Winterman and Aaron Picton were also officers of ADC. Ms. Coates served as President of ADC; Winterman served as the Chief Software Engineer; and, Aaron Picton served as the Chief Technology Officer. Mr. Picton was responsible for accounting matters, and was effectively the Company's Chief Financial Officer.

29.     In their capacity as employees, officers, and agents defendants had access to and acquired extensive knowledge of ADC's trade secrets.

30.     Defendants Winterman Troy Parke, Bryan Parke, Brett Coppess, and Colby Brown were intimately involved in the development of ADC's software package, including the customer interface software, the processing software, and the programming and architecture of ADC's proprietary database. During this process, Mr. Winterman and Mr. Parke learned the

blind alleys that ADC pursued in the development of its software and its proprietary database. They acquired extensive negative knowledge relating to what worked and what did not work in connection with ADC's software and database.

      31.    Defendants Mark Winterman, Troy Parke, Bryan Parke, Brett Coppess, and Colby Brown were also intimately involved in the maintenance of the user interface of ADC's software and its proprietary database. During this process, Mark Winterman, Troy Parke, Bryan Parke, Brett Coppess, and Colby Brown learned and relied on the design and architecture of ADC's software and relied on ADC's trade secrets to correct bugs in the performance of ADC's software.

      32.    All individual defendants also gained extensive knowledge of ADC's cost of goods sold, profit margins, pricing information, marketing strategies, training procedures, customer lists and internal procedures.

      33.    While employed by ADC, Defendant Mark Winterman signed a confidentiality and noncompete agreement requiring Mr. Winterman to maintain in perpetuity the confidentiality of ADC's trade secrets and confidential information. Defendants Mark Winterman, Diana Coates, Aaron Picton, Bryan Parke, and Colby Brown also signed an agreement requiring them to maintain in perpetuity the confidentiality of ADC's trade secrets and confidential information and prohibiting them from working for a competing entity while employed by ADC (referred to herein as the "Agreement").

*(ADC's Receiver)*

34.     In 2011, Sean Hosman, the owner of Allvest Information Services Inc. dba Assessments.com and his wife Tamara Hosman began divorce proceedings.  In February 2012, in the course of the divorce proceedings, the Second Judicial District Court of Davis County appointed Dean Andreasen as Receiver for ADC, as well as other businesses owned, at least in part, by Mr. Hosman.

35.     As Receiver, Mr. Andreasen was given authority to control and operate ADC. Aside from his appointment, all other management of ADC remained in place.  That is, Diana Coates remained the President; Mark Winterman remained the Chief Software Engineer; and Aaron Picton remained the Chief Technology Officer.

36.     In these positions, the officers and employees of the company retained the ability, as well the duty and responsibility to continue to operate the day-to-day business of ADC.

37.     In consultation with the defendants, the Receiver deferred to and relied upon the defendants to operate ADC on a daily basis.

*(The Conspiracy)*

38.     In February 2012, while employees, officers, and agents of ADC, the defendants began to meet privately to discuss their options for forming a new company that would "acquire" the assets of ADC but not inherit any of the liabilities.

39.     The defendants also planned to get existing customers of ADC to pay the remaining fees owed under their maintenance contract with ADC to their new company.

40.     At the close of the meeting, Defendants Bryan Parke, Troy Parke and Colby Brown all expressly stated their agreement to the plan.  "I'm in" Colby Brown and Bryan Parke stated.

41.     The defendants all agreed to discuss the issue further in order to determine when the "time is right."

42.     On March 16, 2012, the defendants formed a new company, Noble Software Group LLC ("Noble").

43.     The Company was organized in the state of Washington, with an address in Burien, Washington.

44.     Upon information and belief, at the time of formation in March 2012, Diana Coates was named the manager of Noble.

45.     As it now operates, Noble provides products and services that directly compete with ADC, and, in fact, depend on, incorporate,  or are based on ADC's proprietary software and supporting database.

*(The Stop in Invoicing)*

46.     While they were planning to start their own company, defendants conspired to create an artificial shortage in ADC's cash flow by halting ADC's invoicing.

47.     In early 2012, while defendants Diana Coates and Aaron Picton were responsible for customer invoicing, ADC failed to send numerous invoices for services provided.

48.     In early 2012 numerous ADC customers requested invoices or other billing information so that they could make payments to ADC.

49.     These messages were forwarded to Diana Coates and Aaron Picton. However, this did not resolve the customers' requests for invoices. Sometime later, at least two clients indicated that they still had not received invoices.

50.     Customers who requested invoices directly from Ms. Coates and Mr. Picton directly were also ignored.

51.     At about the same time, Ms. Coates also directed ADC employees not to cash checks received by ADC in Utah.

52.     As cash flow became an issue, the Receiver, instructed Aaron Picton to provide an accounting of outstanding invoices and amounts due. Mr. Picton failed to fully do so.

53.     After the defendants left the Company, ADC's new bookkeeper reviewed ADC's files and determined that ADC had failed to invoice customers for at least $250,000 worth of services. Critically, this estimate is incomplete as there is no way to determine all services performed by ADC employees who did not enter their time into ADC's time tracking system while being compensated for ADC.

*(Conversion of ADC Property)*

54.     The defendants also conspired to convert ADC's equipment and confidential information and to copy and misappropriate ADC's trade secrets.

55.     On March 6, 2012, well after the defendants agreed to take ADC's "assets" and to form a new company, and only ten days before the defendants formally organized Noble, Troy Parke collected from Bountiful, Utah a significant amount of equipment belonging to ADC. This equipment included monitors, several servers, and 16 boxes of paperwork.

56.   Communications among the defendants indicate that the defendants intended to use the equipment.

57.   The equipment collected was transported from Bountiful, Utah to Redding, California—Noble's new headquarters.

58.   A short time later in late March and early April, the defendant also created a .zip file of all ADC source code from ADC's servers.   The zip files contained much of ADC's software-related files, including but not limited to dynamic-link libraries, the configurations for several of ADC client sites and those for the demonstration site, folders for 6 ADC clients, debugging software, builds, tools, utilities, a developer tool kit for the case plan application, client-specific and generic reports, code for reports, and old scripts.  *Id.*

59.   At approximately this same time, defendant Aaron Picton instructed an ADC employee to enable a process that would copy of the complete files for many of ADC's hosted clients and transfer the copy from ADC's server to an off-site location.  By enabling the transfer, ADC's proprietary database was accessible outside of ADC's protected servers.  Defendant Aaron Picton had the access codes for these files and reactivated the files after access had been shutdown at the request of the Receiver.

60.   From these "backup" files, a person with knowledge of ADC's system could reproduce the complete database. That is, the person could restore the entire ADC database, including the entire database structure, coding and incorporated stored procedures, processes and utilities.

***(Defendants' Solicitation of ADC's Customers)***

61.     On March 14, defendant Jonna Koehn gave notice that as of March 20, she would no longer be working with ADC.

62.     Prior to Ms. Koehn's departure, on March 19, Diana Coates emailed Ms. Koehn, ADC's subscription schedule.  The Subscription schedule contains a list of ADC's current clients, the type of software used by each client, the billing cycle for each client, and the price each client pays for its hosting services or maintenance services.

63.     That same day, Ms. Koehn emailed herself contact information for ADC's clients and also requested from ADC's clients contact information for the clients' decision makers.

64.     One day later, Ms. Coates emailed herself and Troy Parke, at personal email addresses, ADC's standard contract forms.

65.     Beginning on March 20, her last day of work, Jonna Koehn began contacting ADC's customers to set up conferences and meetings for the following week.  These contacts were made from Ms. Koehn's ADC email.

66.     From this date forward, Ms. Coates, Troy Parke, while employees of ADC, and Ms. Koehn, and possibly others, discussed their "new company" with current ADC customers in an effort to solicit away ADC's customers.

67.     Ms. Koehn and likely other defendants informed ADC's clients that ADC would be going out of business within weeks and would no longer be able to service its contracts.

68.     Ms. Coates, Mr. Parke and Ms. Koehn, promised that their "new company" would have the ability to provide training based on ADC's programs (and utilizing ADC's proprietary

Case 1:13-cv-00161-DAK   Document 6-2   Filed 11/15/13   Page 15 of 33

information).  Ms. Koehn and Noble also offered to honor ADC's service contracts and to provide maintenance for ADC's proprietary software.

69.     ADC is informed and believes that defendants negotiated contracts with ADC customers as employees of ADC and then took these contracts to Noble.  For example in February 2012, Robert Barnowski approached defendants about creating a contract between Mr. Barnowski and ADC to develop and customize an application and related database for Seattle Police Department.  It appears that this contract was negotiated for ADC but never consummated the contract for ADC.

*(Noble Began Operating on or around April 2012)*

70.     In early April 2012, the defendants abruptly terminated their employment with ADC and shortly thereafter began operating Noble.

71.     Upon their departure from Noble, Defendants locked ADC's office in Redding, California and refused to grant the Receiver access to the property.

72.     Defendants also retained and refused to return the equipment provided to them by ADC as part of their employment, such as laptops and other personal computer devices and the ADC files and information created and stored on these devices while defendants were employees of ADC.

73.     Defendants Troy Parke and Mark Winterman also deleted all of their Microsoft Outlook files.  In doing so, Parke and Winterman destroyed over ten years of emails, engineering notes, outlines for software design, architectures, concepts and ideas, usernames and passwords

for ADC files such as servers and secured files, proposals and other marketing and sales documents.

74.     Noble provides software that includes the same elements and abilities as ADC's software. Noble also services and maintains software and has indicated that it has the authority and/or ability to service ADC's software.

75.     Upon information and belief, defendants hold the same positions at Noble that they held at ADC.  Ms. Coates serves as President; Mr. Picton performs the company's accounting; Mr. Winterman and Brian and Troy Parke and Colby Brown are all software engineers and design and maintain software.

76.     Given the defendants extensive knowledge of ADC's trade secrets, especially defendants Winterman T. Parke, B. Parke, Brown, and Picton, who were involved in the design and development of ADC's software and are now, upon information and belief, involved in the design and development of Noble's software, it is inevitable that defendants have and will use, rely, or encroach upon ADC's trade secrets.  Defendants cannot eradicate from their minds the ADC trade secrets that they learned from their employment with ADC.

77.     ADC is also informed and believes that defendants Winterman T. Parke, B. Parke, Brown, Coppess and Picton relied on ADC's trade secrets, including the .zip file and other source code that they copied and took from ADC, in creating new software.  ADC is also informed and believes that Noble is using ADC's trade secrets in its business, both to solicit customers and provide maintenance services to its customers.

78.     ADC is also informed and believe that prior to their departure from ADC, one or more defendants began developing software and related services for Noble, while still and employee of ADC, while being paid by ADC, and using ADC's equipment and services. Thus, any software developed at this time, is ADC's software and ADC's trade secret.

*(Continuing Interference with Customer Relationships)*

79.     Noble has continued to interfere with ADC's customer relationships by misrepresenting that ADC is not a financial viable entity and by representing that it has the ability and authority to takeover over the maintenance of ADC's software, which in many cases should have been returned to ADC if the contract with ADC is terminated.

80.     Noble has even gone so far as to assume contracts ADC had with clients.

81.     In other instances Noble has entered new contracts to maintain ADC's software and databases—the same databases that ADC engineers transferred outside ADC's protected servers to a remote online location, at the direction of Mr. Picton just prior to his resignation from ADC.

82.     Most recently, ADC has learned that Noble has been awarded two contracts with large customers of ADC.

83.     The contracts awarded are for software and services identical to the software and services previously provided by ADC.

84.     Critically to switch from ADC to Noble, the contracts require the ability to either transfer or accept data from the previous ADC database or to utilize ADC's proprietary database.

85.     As one customer, Kern County Probation Department, pointed out, ADC's software is proprietary and therefore, other than ADC, the only software company, "that utilizes the same assessment tool and maintains the existing [ADC] assessment software application" is Noble.  For this reason, Kern County single sourced its contract to Noble and did not take bids from any other entities.

86.     Noble's use of the "same tool" and maintenance of ADC's software allows Kern County and other customers to "utilize[e] the existing [ADC] database with minimal changes."

87.     Without question, Noble is using ADC's trade secrets.  As Kern County explicitly stated: "***Noble will utilize the current existing database, the same principles and processes, and there should be no integration changes to the department's case management system.***"

88.     In addition to these two recent contracts, at least 10 other ADC clients who cancelled service with ADC are now being serviced by Noble.  Defendants worked closely with all of these clients when they were employees of ADC.

89.     Defendants have acted intentionally and in blatant disregard of her contractual obligations, promises and assurances to ADC.

90.     Defendants' solicitation of business and their communications with ADC's customers violate the Agreement and have caused ADC injury, including the loss of customer goodwill, revenues, and profits, including future profits.

91.     As a direct result, ADC's volume of business with clients formerly serviced by defendants has decreased; defendants are blatantly taking ADC's business with existing clients and diverting it to Noble.

Case 1:13-cv-00161-DAK   Document 6-2   Filed 11/15/13   Page 19 of 33

92.     ADC has suffered and will continue to suffer irreparable harm if Defendants continue to damage ADC's client relationships, and/or solicit or accept business from ADC's client using ADC's trade secrets.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

93.     ADC hereby incorporates all other allegations of this Complaint.

94.     Defendants entered into an Agreement with ADC to maintain the confidentiality of ADC's proprietary information and trade secrets.  Defendants also agreed not to perform any work for competing entities.

95.     Defendants breached the Agreement by organizing and performing work for Noble a competing company while employed by ADC.

96.     Defendants also breached the Agreement by, on information and belief, sharing ADC's confidential information with competitors of ADC and other third parties, including Noble.

97.     As a proximate result of these breaches, ADC has been damaged and irreparably harmed, and will continue to suffer such harm.  As a further proximate result of these breached, defendants have been unjustly enriched in an amount subject to proof.

98.     Accordingly, ADC is entitled to a temporary and/or permanent injunction barring Defendants from further soliciting any of ADC's clients and any other action that violates the Agreement, during the one-year period of the non-solicitation restriction.

99.     ADC is also entitled to a temporary and/or permanent injunction barring Defendants from further sharing ADC's confidential information with ADC's competitors or other third parties, including Noble.

100.     Further, and by reason of such conduct on the part of Defendants, ADC is also entitled to judgment for its compensatory and consequential damages in an amount to be fairly and reasonably set by the jury.

101.     Further, ADC is entitled to recover all attorneys' fees reasonably incurred in establishing the aforementioned violations of the Agreement.

Wherefore, ADC prays for judgment as hereinafter set forth.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)
### Utah Code Ann. § 13-25-1, et seq.
### [Against all Defendants]

102.     ADC hereby incorporates all other allegations of this Complaint.

103.     ADC is the owner of certain trade secrets described above.  Said trade secrets derive economic value for ADC by not being known to its competitors and permit ADC to market a product superior to its competitors' products.  ADC has taken reasonable steps to protect the secrecy of said trade secrets.

104.      While still employed with ADC or sometime thereafter, defendants misappropriated ADC's trade secrets for the unlawful purposes of competing unfairly against ADC.  In addition, it is inevitable that defendant Mark Winterman and defendant Bryan Parke has already disclosed or will disclose ADC's trade secrets to Noble and other third parties.

105.    Defendants know or should have known that the information and software transferred to Noble by Mark Winterman and Bryan Parke were ADC's trade secrets, and that Mr. Winterman and Mr. Parke had a duty to maintain the secrecy of said trade secrets.

106.    As a proximate result of defendants' conduct, ADC has been damaged and continues to suffer damages in an amount according to proof, but in excess of the jurisdictional amount. As a further proximate result of the misappropriation, defendants have been unjustly enriched in an amount subject to proof.

107.    ADC is informed and believes that the misappropriation described herein was willful and malicious, and the defendants acted willfully and maliciously in wanton disregard of ADC's rights. As a consequence thereof, ADC is entitled to an award of exemplary damages and attorneys fees under Utah Code sections 13-24-4 and -5.

108.    Defendants' wrongful conduct in misappropriating ADC's trade secrets unless and until enjoined and restrained by order of this court will cause great and irreparable injury to ADC's business.

109.    ADC has no adequate remedy at law for the injuries currently being suffered and which are threatened in that defendants will continue to misappropriate ADC's trade secrets and ADC would be required to maintain a multiplicity of judicial proceedings to protect its interests.

Wherefore, ADC prays for judgment as hereinafter set forth.

## THIRD CLAIM FOR RELIEF
### COMMON LAW MISAPPROPRIATION OF TRADE SECRETS
### [Against All Defendants]

110.    ADC hereby incorporates all other allegations of this Complaint.

111.   ADC is the owner of certain trade secrets described above.  Said trade secrets derive economic value for ADC by not being known to its competitors and permit ADC to market a product superior to its competitors' products.  ADC has taken reasonable steps to protect the secrecy of said trade secrets.

112.   ADC is informed and believes, and thereon alleges, that Defendants have misappropriated ADC's trade secrets for the unlawful purposes of competing unfairly against ADC.  In addition, it is inevitable that Winterman and Parke have already or will disclose ADC's trade secrets to Noble and other third parties .

113.   Defendants knew or should have known that the information and software taken by defendants were ADC's trade secrets, and that Defendants had a duty to maintain the secrecy of said trade secrets and/or that defendants had acquired said trade secrets through improper means.

114.   As a proximate result of defendants' conduct, ADC has been damaged in an amount according to proof, but in excess of the jurisdictional amount.  As a further proximate result of the misappropriation, defendants have been unjustly enriched in an amount subject to proof.

115.   ADC is informed and believes that the misappropriation described herein was willful and malicious, and the defendants acted willfully, maliciously, and in reckless disregard of ADC's rights.  As a consequence thereof, ADC is entitled to an award of exemplary and punitive damages.

116.   Defendants' wrongful conduct in misappropriating ADC's trade secrets unless and until enjoined and restrained by order of this court will cause great and irreparable injury to ADC's business.

117.   ADC has no adequate remedy at law for the injuries currently being suffered and which are threatened in that defendants will continue to misappropriate ADC's trade secrets and ADC would be required to maintain a multiplicity of judicial proceedings to protect its interests.

Wherefore, ADC prays for judgment as hereinafter set forth.

### THIRD CLAIM FOR RELIEF
**(Tortious Interference with Corporate Opportunities)**
**[Against All Defendants]**

118.   ADC hereby incorporates all other allegations of this Complaint.

119.   ADC had favorable business relations with its customers in the probation services industry and with its employees.

120.   ADC had a reasonable expectation of continuing with those business relationships.

121.   Defendants interfered with those relations by engaging in the actions stated above, including misrepresenting to ADC's clients that ADC would be closing its business and would no longer able to services it contracts, offering to provide maintenance services that Noble was not authorized to provide, and offering to provide services that rely on ADC's trade secrets.  .

122.   ADC is informed and believes that the misappropriation described herein was willful and malicious, and the defendants acted willfully, maliciously, and in reckless disregard

of ADC's rights.  As a consequence thereof, ADC is entitled to an award of exemplary and punitive damages.

123.    Defendants' wrongful conduct in misappropriating ADC's trade secrets unless and until enjoined and restrained by order of this court will cause great and irreparable injury to ADC's business.

124.    ADC has no adequate remedy at law for the injuries currently being suffered and which are threatened in that defendants will continue to interfere with ADC's corporate opportunities and ADC would be required to maintain a multiplicity of judicial proceedings to protect its interests.

Wherefore, ADC prays for judgment as hereinafter set forth.

### FOURTH CLAIM FOR RELIEF
**(Breach of Duty of Loyalty)**
**[Against All Defendants]**

125.    ADC hereby incorporates all other allegations of this Complaint.

126.    As officers, employees and agents of ADC, defendants were given access to ADC's trade secrets and confidential information and given management responsibilities over ADC's employees and equipment.  As such, defendants owed ADC a fiduciary duty to act toward ADC fairly, honestly, in good faith and with undivided loyalty with respect to the confidential and proprietary information to which defendants were given access and the equipment and employees over which he was given management responsibility.  Defendants owed ADC a fiduciary duty and remain obligated to maintain the confidentiality of ADC's trade secrets and other proprietary or confidential information and to refrain from any act, or omission

to act, calculated or likely to: (a) injure ADC; (b) disclose ADC's trade secrets or other confidential or proprietary information to third parties; (c) misappropriate to their personal advantage ADC's trade secrets, other confidential or proprietary information or customer opportunities; (d) interfere with ADC's existing or prospective contractual and economic relationships by using ADC's trade secrets or proprietary or confidential information; or (e) divert ADC's customers to their own or a competitor's use by using ADC's trade secrets or proprietary or confidential information.

127.    As officers and employees of ADC, defendants also owed ADC a duty of loyalty that prohibited them from competing with ADC concerning the subject matter of their agency or employment, without ADC's knowledge and agreement, during the course of their employment with ADC.

128.    While still employed by ADC, Defendants worked in concert to form Noble a company that competes directly with ADC and to solicit ADC's employees and clients to switch their employment and contracts to Noble.

129.    Such solicitation of ADC employees and clients to join the competitor was in direct competition with ADC.

130.    This competitive activity of defendants concerned the subject matter of their agency or employment, in that they were forming a competing business to perform the same kinds of services they were then providing to ADC and to ADC's clients and based on ADC's trade secrets and proprietary information.

24

131.    Moreover, defendants breached their fiduciary duty to ADC by misappropriating ADC's trade secrets for their own benefit and/or defendant Noble's benefit.

132.    Defendants' breach of fiduciary duty in relation to ADC's trade secrets threatens to and will cause great and irreparable injury to ADC in that such conduct could result in a serious diversion of ADC's business to Noble.  The damages that ADC has and will sustain as a result of defendants' breach of fiduciary duty cannot be readily ascertained or calculated.  Unless injunctive relief as prayed for herein is granted, a final judgment may be ineffective in restoring the value of ADC's trade secrets.  For that reason, Plaintiffs have no adequate remedy at law for such acts and threatened acts.

133.    Defendants' breach of fiduciary duty by conspiring to form Noble and to solicit away ADC clients during their employment by ADC has caused ADC significant damages in the form of lost revenue and profits and unearned salaries.

134.    Defendant's breach of fiduciary duty was willful and intended to cause injury to ADC in that defendants acted with oppression, fraud and malice.  Because of defendants' conduct, ADC is entitled to punitive and exemplary damages against defendants.

Wherefore, ADC prays for judgment as hereinafter set forth.

### FIFTH CLAIM FOR RELIEF
#### (Breach of Duty of Care and Diligence)
#### [Against All Defendants]

135.    ADC hereby incorporates all other allegations of this Complaint.

136.    As officers, employees, and agents of ADC, defendants owed ADC a fiduciary duty to use their ingenuity, influence, and energy, and to employ all the resources of the

corporation, to preserve and enhance the property and earning power of the corporation, even if the interests of the corporation are in conflict with their own personal interests.  This duty is especially vital when the corporation is in financial difficulty.

137.    Defendants breached this duty while officers, employees, and/or agents of ADC by diverting their energy and influence to benefit their own company, Noble, rather than ADC.

138.    Defendants also preached this duty by intentionally failing to perform their responsibilities including consistently invoicing as provided in ADC's contracts and for work performed by ADC employees.

139.    Defendants' breach of fiduciary duty during their employment by ADC has caused ADC significant damages in the form of lost revenue and profits and unearned salaries.

140.    Defendant's breach of fiduciary duty was willful and intended to cause injury to ADC in that defendants acted with oppression, fraud and malice.  Because of defendants' conduct, ADC is entitled to punitive and exemplary damages against defendants.

Wherefore, ADC prays for judgment as hereinafter set forth.

### SIXTH CLAIM FOR RELIEF
**(Civil Conspiracy)**
**[Against all Defendants]**

141.    ADC realleges and incorporates the allegations of this Complaint.

142.    Defendants combined together to misappropriate ADC's trade secrets and other confidential information, to breach their confidentiality obligations, breach their duties of loyalty and care owed to ADC, to misrepresent and disparage ADC, and to interfere with ADC's clients.

143.    The object of defendants' conspiracy was to form a new company that would perform the same services and offer the same software as ADC and to takeover ADC's' clients by misappropriating ADC's trade secrets and other confidential information, breaching their confidentiality obligations, breaching their duties of loyalty and care owed to ADC, misrepresenting and disparaging ADC, and interfering with ADC's clients.

144.    Defendants had a meeting of the minds on the above course of action.

145.    ADC is informed and believes, and thereon alleges, that the defendants' intentional conduct described herein was willful and malicious, and the defendants acted willfully, maliciously, and in reckless disregard of ADC's rights.  As a consequence thereof, ADC is entitled to an award of exemplary and punitive damages.

Wherefore, ADC prays for judgment as hereinafter set forth.

### SEVENTH CLAIM FOR RELIEF
#### (Conversion)
#### [Against all Defendants]

146.    ADC realleges and incorporates the allegations of this Complaint.

147.    At all times mentioned herein, ADC maintained a valid ownership interest in the Subscription Agreement, ADC's Training Materials, ADC's Marketing Materials, ADC's corporate documents and files, and the equipment and other tangible property purchased by ADC.

148.    Based upon information and belief, Plaintiffs allege that defendants have wrongfully and secretly taken for their own private use, benefit and enjoyment and for the use, benefit and enjoyment of Defendant Noble in disregard of ADC's rights, the Subscription

Agreement, ADC's Training Materials, ADC's Marketing Materials, ADC's corporate documents and files, and the equipment and other tangible property purchased by ADC.

149.    As a proximate result of defendants' wrongful conversion, ADC has been deprived of the exclusive possession of the Subscription Agreement, ADC's Training Materials, ADC's Marketing Materials, ADC's corporate documents and files, and the equipment and other tangible property purchased by ADC, and the proceeds thereof.  ADC has been damaged in a sum not yet ascertained.

150.    In converting the Subscription Agreement, ADC's Training Materials, ADC's Marketing Materials, ADC's corporate documents and files, and the equipment and other tangible property purchased by ADC, defendants' conduct was willful and was intended to cause injury to Plaintiffs in that defendants acted with oppression, fraud and malice in taking proprietary files and otherwise misappropriating ADC's property to deprive ADC of substantial ongoing customer business and the ability to fulfill business requests.  Plaintiffs are therefore entitled to an award of exemplary or punitive damages in an amount according to proof at trial.

### EIGHTH CLAIM FOR RELIEF
**UNFAIR COMPETITION**

**UTAH CODE ANN. § 13-5a-102**
**[Against All Defendants]**

151.    ADC realleges and incorporates the allegations of this Complaint.

152.    The actions of defendants alleged above constitute unfair methods of competition under Utah Code section 13-5a-102.  Specifically, defendants have infringed on ADC's trademark and trade name and violated ADC's software licenses.

153.    As a proximate result of defendants' conduct, ADC has been damaged in an amount according to proof, but in excess of the jurisdictional amount, which damages are to be trebled, and, in any event, in the amount of statutory damages under Utah Code Ann. § 13-5-14.

154.    Defendants' wrongful conduct unless and until enjoined and restrained by order of this court will cause great and irreparable injury to ADC's business. ADC has no adequate remedy at law for the injuries currently being suffered and which are threatened in that defendants will continue to misappropriate ADC's trade secrets and ADC would be required to maintain a multiplicity of judicial proceedings to protect its interests.

155.    Wherefore, ADC prays for judgment as hereinafter set forth.

### NINTH CLAIM FOR RELIEF
### COMMON LAW UNFAIR COMPETITION
### [Against All Defendants]

156.    ADC realleges and incorporates the allegations of this Complaint.

157.    The actions of defendants alleged above constitute unfair methods of competition under Utah law.  Specifically, defendants have infringed on ADC's trademark and trade name and violated ADC's software licenses.

158.    As a proximate result of defendants' conduct, ADC has been damaged in an amount according to proof, but in excess of the jurisdictional amount, which damages are to be trebled, and, in any event, in the amount of statutory damages under Utah Code Ann. § 13-5-14.

159.    Defendants' wrongful conduct unless and until enjoined and restrained by order of this court will cause great and irreparable injury to ADC's business. ADC has no adequate remedy at law for the injuries currently being suffered and which are threatened in that

defendants will continue to misappropriate ADC's trade secrets and ADC would be required to maintain a multiplicity of judicial proceedings to protect its interests.

Wherefore, ADC prays for judgment as hereinafter set forth.

**<u>REQUEST FOR RELIEF</u>**

WHEREFORE, ADC prays this court for judgment against defendants jointly and severally as follows:

1.  For a temporary restraining order

2.  For preliminary and permanent injunctions enjoining defendants and their directors, officers, agents, servants, and employees, resellers and sublicensees and all persons acting under, in active concert or privity with, or for them:

    a.  From misappropriating in any way ADC's trade secrets, including from using, marketing, offering, selling, reproducing, licensing, developing and distributing ADC's software;

    b.  From soliciting, interfering, accepting business from, providing probation assessment and management software and related services to, or otherwise contacting ADC's customers, clients or patients.

    c.  From employing Mark Winterman and Bryan Parke, or at a minimum from employing Mark Winterman and Bryan Parke in any position where their job function would lead them to rely on trade secrets belonging to ADC;

    d.  From failing to return to ADC all copies of ADC's software and any and all materials containing ADC's trade secrets, along with a certification signed by an officer of defendants that no copies have been retained for any purpose whatsoever;

3.   For an order requiring defendants to file with the Court and to serve on ADC within 30 days after service of the Court's order as herein prayed, a report in writing under oath setting forth in detail the manner and form in which defendants have complied with the Court's order.

4.   For general and special damages in an amount according to proof at trial;

5.   For an accounting and disgorgement of all illegal gains, profits and benefits derived from defendants' acts of misappropriation;

6.   For an order requiring that all illegal gains, profits and advantages derived by defendants from their misappropriation be deemed to be in constructive trust for the benefit of ADC.

7.   For ADC's attorneys' fees as authorized by law;

8.   For costs of suit incurred herein;

9.   For interest on the damages awarded;

10. For punitive damages;

11. For such other and further relief as the court may deem proper.

### DEMAND FOR JURY TRIAL

ADC hereby demands a trial by jury of all issues triable by a jury.

### TIER DESIGNATION

Pursuant to Utah Rules of Civil Procedure 8(a) and 26(c) (3), this matter falls under Tier 3 and should be permitted discovery pursuant to Tier 3.

DATED this 29th day of October, 2013.

RAY QUINNEY & NEBEKER P.C.


/s/ Mark M. Bettilyon
Mark M. Bettilyon
Mica McKinney
*Attorneys for ADC*

Plaintiff's Address

Dean Andreasen, as Receiver
For Allvest Information Services Inc.
201 South Main Street, 13th Floor
Salt Lake City, UT 84111
1253595